IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE MILL STEAL COMPANY, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. 2:14-CV-1023-WKW ) (WO–Do Not Publish) |
| SOUTHEASTERN STUD & COMPONENT, INC., *et al.*, | ) ) ) |
| Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

Before the court are Plaintiffs' Motion to Stay Entire Litigation in Light of Bankruptcy (Doc. # 27), Defendants' Motion for Preliminary and Permanent Injunction (Doc. # 29), and Plaintiffs' Motion to Expedite Hearing on Defendants' Motion for Injunction (Doc. # 39). For the reasons that follow, Plaintiffs' Motion to Stay Litigation in Light of Bankruptcy (Doc. # 27) is GRANTED and all other pending motions are DENIED as moot.

### **I. BACKGROUND**

The parties first entered into a supply agreement backed by a credit facility ("Credit and Supply Agreement") in 2011, whereby Defendants Southeastern Stud & Component, Inc. ("SES"), Dixieland Metals of Alabama, L.L.C. ("DMA") and K2 Enterprises, L.L.C. ("K2") (collectively "the Defendant companies") would obtain raw, rolled steel from Plaintiff Mill Steel, by bailment, to unwind, split, and mold into steel studs for sale to various commercial consumers. The Defendant companies paid off the debts under the

initial agreement in 2013 with the intent of contracting with a different steel supplier. When negotiations with other suppliers fell through, however, the Defendant companies returned to Mill Steel. On October 23, 2013, Mill Steel entered into a second Credit and Supply Agreement[1] with the Defendant companies. In order to secure the new arrangement, Kennon Whaley — the major equity holder of SES, DMA and K2 — pledged *all* of SES's assets and 100% of his personal stock rights in SES, as well as the assets of a galaxy of related entities, to Plaintiffs.

The parties operated under the agreement until the spring of 2014 when they began another negotiation, this time over the Defendant companies' alleged defaults under the new Credit and Supply Agreement. Tensions between the parties came to a head on August 12, 2014, when Mill Steel sent the Defendant companies a Notice of Default. The Notice of Default alleged that the Defendant companies had failed to make required payments, incurred a debt in excess of the agreed-upon credit cap, failed to properly report the use of bailment product, failed to timely forward payments from customers who purchased product financed under the Credit and Supply Agreement, and failed to properly take inventory and report the use of bailment product. Mill Steel charged that the deficiencies constituted Events of Default under the Credit and Supply Agreement.

---

[1] The Credit and Supply Agreement is embodied in the following series of documents: (1) a Supply Agreement; (2) a Credit and Security Agreement; (3) a Stock Pledge Agreement concerning SES; (4) an Assignment and Pledge of Membership Interest of Kennon Whaley; (5) an Assignment and Pledge of Membership Interest of K2; and (6) and a Guaranty Agreement. (Doc. # 3-3.) An issue raised by SES is whether the Bank Control Agreement originally signed in 2011 as part of the first Credit and Supply Agreement was incorporated into and in effect as part of the 2013 Credit and Supply Agreement. No doubt the question is important, but, as will be seen, its resolution rests initially with the bankruptcy court.

Mill Steel alleges that the Defendant companies failed to cure the defaults, resulting in the filing of this suit on October 2, 2014.  With their complaint, Plaintiffs filed a motion for the appointment of a receiver, in which they argued that a receiver was necessary to "investigate and secure the safety of the Collateral and Products and to stop any further loss or misapplication of Plaintiffs' Collateral and Products" (Doc. # 1 at 12), and a motion to expedite the hearing on the motion for appointment of a receiver (Doc. # 2).[2]  Approximately two weeks after first moving for the appointment of a receiver, however, Plaintiffs withdrew the request.  (Doc. # 19.)

On October 23, 2014, counsel for all parties participated in an early status conference to assess the present litigation.  The court inquired into the withdrawal of Plaintiffs' motion for the appointment of a receiver and asked whether the parties "anticipat[ed] some other kind of receiver in the case."  (Doc. # 28 at 5.)  In response, Plaintiffs' counsel indicated that Plaintiffs "have other rights and remedies" that they were exploring.  (Doc. # 28 at 5.)  Foretelling the nature of the aforementioned rights and remedies, Defendants' counsel informed the court that two weeks prior to the status conference, Plaintiffs invoked the Bank Control Agreement, freezing SES's sole bank account with Sterling Bank. Moreover, two days prior to the status conference, Plaintiffs notified the Defendant companies that Plaintiffs were exercising their rights under the

---

[2] Defendants contend that these filings, as well as the subsequent amended complaint and amended motion for the appointment of a receiver, were all filed without them ever being properly served or provided an opportunity to respond.  The record, however, indicates that summons were issued to all Defendants, and each summons was returned unexecuted with the following United States Postal Service notation: "Returned to Sender, Refused." (Docs. # 6-13.)

Stock and Membership Interest Pledge Agreements. At the close of the status conference, and in recognition of the withdrawal of the motion to appoint a receiver, the court and all parties indicated that the litigation would proceed in the normal course. In light of the actions recently taken by Plaintiffs to protect their collateral and products and the overall nature of the dispute, however, it was not lost on the court that the normal course of litigation could very possibly lead to bankruptcy court in some form or fashion.

Thus, the court was not surprised to receive SES's notice of bankruptcy three days after the status conference. However, the process by which SES filed its Chapter 11 Bankruptcy petition was atypical. Plaintiffs, operating under the Credit and Supply Agreement, Stock and Membership Interest Pledge Agreements, and a Power of Attorney, exercised their out-sized creditor rights and literally took over SES. They effected an SES stockholders' meeting by unanimous written consent and replaced the existing Board of Directors with a new Board. The CFO/COO of Mill Steel was named the President and CEO of SES. The new management of SES then removed funds from the Sterling Bank account to retain a law firm for the purposes of filing a Chapter 11 Bankruptcy petition on behalf of SES. Once the petition was filed, Plaintiffs moved to stay the litigation in this court in light of the bankruptcy of SES. (Doc. # 27.)

On October 27, 2014, emergency motions were filed by Plaintiffs (as creditors) in the bankruptcy court and an emergency hearing was held by Bankruptcy Judge Williams the same date. During the hearing, counsel of record for the Defendants in this action indicated that they intended to file a motion for a temporary restraining order in this action and, in deference to the pending matter, the bankruptcy judge delayed ruling on most of

4

the emergency motions filed by Plaintiffs. The bankruptcy judge did, however, order that funds made payable to the debtor not previously deposited into the Sterling Bank account be transferred into the custody and control of the new management of SES.

In response to the actions taken in bankruptcy court, the former management of SES and other Defendants filed a motion for preliminary injunction in this court on October 29, 2014, in which they argued that Plaintiffs orchestrated the alleged defaults of the Defendants in a "calculated attempt to destroy the business of SES." (Doc. # 29 at 10.) Defendants sought the continued jurisdiction of this court, arguing that an "unwinding" of the bankruptcy action and a return to the status quo for litigation in the district court would be appropriate.

Meanwhile, the former management of SES and other Defendants recently filed an answer and counterclaims against Plaintiffs in this action, in the name of SES and the other Defendants, and assuredly without authorization of the current creditor-controlled management of SES.[3] The court is further informed that other creditors are waiting in the wings to file involuntary bankruptcy petitions, SES is shut down and over 60 workers are laid off, expenses are being incurred to preserve and insure assets, and the parties languish with one foot in the jurisdiction of this court and the other in the jurisdiction of the bankruptcy court.[4] Despite assurances of counsel and the best intentions of the judges

---

[3] Should the court in its discretion decide to hear the matter further, the first question to be addressed is a very practical one: Who would sit at counsel table, and speak, for SES?

[4] Pursuant to 28 U.S.C. § 157(a), all bankruptcy matters in the district court are handled by referral to the bankruptcy court — a jurisdictional conundrum not addressed by any party.

involved, no litigation is moving apace. Under all the circumstances, and the law as will be explained, the situation is intolerable and is due to be resolved in the bankruptcy court.

## II. AUTOMATIC BANKRUPTCY STAY

When SES, acting under the control of new management, filed a voluntary Chapter 11 Bankruptcy, it triggered an automatic stay. Under § 362 of the Bankruptcy Code, the filing of a bankruptcy petition triggers the automatic, blanket stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy petition]." U.S.C. § 362(a)(1). Section 362(a)(3) further expands the scope of the stay to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . . ." This is precisely the action proposed by the former management of SES in its efforts, via litigation in this court, to avoid the stay in bankruptcy court. Former management seeks to obtain, at the very least, "control over the property of the estate."

At first blush, it may seem that the action of the former management of SES in seeking a preliminary injunction falls outside the scope of § 362(a) because it may be seen as an action taken *by* the debtor and not *against* the debtor and § 362(a)(1) only operates to stay actions taken "against the debtor." Such a view, however, is insufficiently nuanced to capture the intricacies of the present case. When the Plaintiffs invoked the various features of the Credit and Supply Agreement, they effectively took control of SES and placed SES into voluntary bankruptcy. As a result, they shielded SES's estate from "the commencement or continuation" of any "action or proceeding against the debtor" estate

6

and "any action to obtain possession of property of the estate . . . or to exercise control over the property of the estate." §§ 362(a)(1), (a)(3). Continuing with this analysis, the present action taken in the name of the Defendants — including the prior management of SES — in seeking to unwind the bankruptcy and reassume control of SES, must be viewed as an action taken *against* the current debtor estate. Accordingly, Defendants' motion falls within the bounds of § 362(a)'s automatic stay.

The arguments of the former management of SES requesting the "unwinding" of the bankruptcy by action in the district court are unavailing for two reasons. First, "unwinding" a bankruptcy is not a term of art, and no party has demonstrated otherwise. The court is unaware of any authority, and the parties have pointed to none, to defeat generally the jurisdiction of the bankruptcy court once a petition is filed and the stay drops into place. Second, the concept of "unwinding" should be directed to the exercise of creditor rights under the documents governing the relationship rather than to the bankruptcy proceeding itself. The court understands that this is the ultimate argument of the former management of SES, but untangling that knotty ball of twine is a full lawsuit in itself, as demonstrated by the filings, and would leave the parties in an indefinite state of managerial gridlock.

The very heart of bankruptcy protection and related proceedings includes the orderly administration of just such corporate disputes as this. As a fellow district judge in this Circuit observed, "an important purpose of the automatic stay is to prevent a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *In re Atlas*, 222 B.R. 656, 659 (S.D. Fla. 1998) (*quoting Matter of*

*Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982)). Indeed, were this court to exercise its discretion to take up the dispute again, the first thing it would do, *sua sponte* if necessary, would be to appoint a receiver to protect and manage the assets at issue. Such a course would be duplicative of the trustee system of the bankruptcy court, wasteful of the limited resources of this court, expensive for the parties, and legally foolish. On the other hand, the bankruptcy court is situated so that creditors, debtors and equity-holders alike receive due process. "A judicial analysis of the automatic stay is to focus on 'the value of preserving the debtor's estate.'" *United States v. ILCO, Inc.*, 48 B.R. 1016 (N.D. Ala 1985).

While the bankruptcy judge has deferred ruling on the motions presently before him, he has yet to lift the automatic stay statutorily imposed on the present litigation, and as a result, this court must adhere to the requirements of § 362(a) and stay this matter pending a resolution in bankruptcy. Moreover, this court is of the mind that the present interwoven nature of the Defendant companies — all but SES under the direct control of Defendant Whaley — and the likelihood that any future litigation in this court would necessarily require the participation of SES (participation which, under hostile management, is not a given) points toward a stay to cover the entirety of the present litigation, at least temporarily. *See Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) (highlighting the district court's "inherent authority to manage its own docket so as to achieve an orderly and expeditious disposition of cases") (internal quotations omitted).

### III.  PRELIMINARY INJUNCTION

While the proper reach of § 362(a) necessitates that the present litigation be stayed so that the pending bankruptcy action may run its course, the court additionally finds, insofar as jurisdiction allows, that the Defendants have failed to meet the heavy burden necessary for a preliminary injunction.

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court."  *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). To prevail on a motion for a preliminary injunction, the moving party bears the burden of demonstrating that

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 1177, 1198 (11th Cir. 2009) (*quoting Siegel v. LePore*, 234 F.3d 1163, 1167 (11th Cir. 2000)).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites."  *Id*.

The crux of the former management of SES and the other Defendants' argument in favor of a preliminary injunction is that Plaintiffs orchestrated the default of SES in a calculated attempt to destroy SES's business and further, Plaintiff Mill Steel repeatedly defaulted under the Credit and Supply Agreement by failing to timely deliver conforming steel prior to any alleged default by the Defendants.  In sharp contrast to this argument,

however, is Mr. Whaley's September 2, 2014 testimony provided in his criminal case during a hearing on a petition to modify conditions.[5]   Under oath, Mr. Whaley stated the following:

> So in order for [Mill Steel] to give us credit, he's taken a first lien on everything I own. Every company I have, he's got first lien rights, he's got stock pledge agreements, he's got bank control agreements. They can go in and take money. They can just come in and take over. And Southeastern is the key, and right now Southeastern is in default. We're in default because financial reporting was not done properly.

(Doc. # 46, Ex. A at 10-11).   In light of the prescient testimony of Mr. Whaley and the significant opposition of Plaintiffs, the former management of SES and other Defendants cannot demonstrate that Defendants are substantially likely to prevail on the merits. Because of the failure to demonstrate a substantial likelihood of success on the merits, the other elements of the preliminary injunction test need not be addressed.[6]   Defendants' (through SES's former management) motion for preliminary injunction is due to be denied.

## IV.  CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that Plaintiffs' Motion to Stay Litigation in Light of Bankruptcy (Doc. # 27) is GRANTED and all other pending motions are DENIED as moot. It is further ORDERED that, on the first day of each second

---

[5] *United States v. Whaley*, In the United States District Court for the Middle District of Alabama, Northern Division, Case No. 2:14-cr-426-WKW.

[6] If pressed to address them, the court would find that *entry* of an injunction would actually cause irreparable harm and outweigh any perceived benefits, and would be adverse to the public interest in the orderly administration and disposition of estates in bankruptcy.

month, beginning February 1, 2015, the parties are DIRECTED to file a joint report as to the status of the bankruptcy proceedings.

DONE this 26th day of November, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
